**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **TIMOTHY BOOKER** | * | **CIVIL ACTION** |
| **VERSUS** | * | **NO: 05-0245** |
| **BURL CAIN** | * | **SECTION: "A"(6)** |

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to Title 28, United States Code, Sections 636(b)(1)(B) and (C), and, as applicable, Rule 8(b) of the Rules Governing Section 2254 cases. Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See Title 28, United States Code, Section 2254(e)(2). Accordingly, it is recommended that the petition be **DENIED WITH PREJUDICE.**

## I.  PROCEDURAL HISTORY

Petitioner Timothy Booker is a state prisoner who is presently incarcerated at the Louisiana State Penitentiary, Angola, Louisiana. Booker was charged by grand jury

indictment with the second degree murder of Chantell Duncan, in violation of La. R.S. 14:30.1.(2)(b).[1]   Following trial by jury, Booker was convicted as charged and was sentenced to life imprisonment.

Pursuant to Booker's appeal, his conviction and sentence were affirmed by the Louisiana First Circuit Court of Appeal on February 14, 2003.  **State v. Booker,** 839 So.2d 455 (La. App. 1 Cir. 2003).  On October 31, 2003, the Louisiana Supreme Court denied Booker's writ application, thereby rendering his conviction and life sentence final.  **State v. Booker,** 857 So.2d 476 (La. 2003).

After unsuccessfully seeking post-conviction relief from the state courts, Booker, in January, 2005, filed the instant application for federal habeas corpus relief. Booker claims that the evidence presented at trial was constitutionally insufficient to support his conviction and that La. R.S. 14:30.1 and La. R.S. 14:93 are unconstitutionally vague as applied to him.

It is well-established that a petitioner must exhaust his available state court remedies before proceeding to federal court for habeas relief.  Title 28, United States Code, Section 2254 (b)(1)-(3); **Rose v. Lundy,** 455 U.S. 509, 102 S. Ct. 1198, 71 L.Ed.2d 379 (1982).  The Court has determined that petitioner's petition was timely filed and that

---

[1]The indictment also charged the victim's mother, Kenisha Duncan, with the same offense.  On motion of Timothy Booker, the co-defendants were severed for purposes of trial. See **State v. Kenisha Duncan,** 835 So.2d 623 (La. App. 1st Cir. 2002).

2

petitioner has exhausted his federal claims in the highest state court.  Accordingly, this Court will address the merits of the petition.

### Statement of Fact[2]

Kenisha Duncan and her four-year old daughter, Chantell Duncan, lived in an old, dilapidated caretaker's cottage with the defendant, Timothy Booker.  The cottage was located adjacent to a larger home (the main house) on a piece of property on Riverside Drive in Covington.  On the cold and rainy winter morning of December 18, 2000, Kenisha called 911 and requested emergency medical assistance for Chantell.  St. Tammany Parish Fire District responded to the call. Upon arriving at the Riverside property, the paramedics found Chantell lying in a bed inside the main house, clad in a sleeveless top and shorts.  The child had no pulse or respiration and was extremely cold to the touch.  The paramedics immediately began administering cardio-pulmonary resuscitation (CPR).  Chantell was subsequently transported, by ambulance, to the St. Tammany Parish Hospital where emergency room physicians continued the resuscitation efforts.  The doctors also worked to raise the child's body temperature, which was down to approximately 80 degrees.  Once Chantell was successfully resuscitated, she was transported to Children's Hospital in New

---

[2]This Statement of Fact was taken from the published opinion issued in **State of Louisiana v. Timothy Booker,** 839 So.2d 455, 458 (La. App. 1 Cir. 2003).

Orleans for intensive care.   Despite all efforts to save her, Chantell died several hours later. An autopsy report and death certificate listed hypothermia, battered child syndrome, and malnourishment as the causes of Chantell's death.

## <u>Standard of Review</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") includes a comprehensive overhaul of federal habeas corpus legislation, including Title 28, United States Code, Section 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law where there has been an adjudication on the merits in State court proceedings.

State court determinations of questions of law and mixed questions of law and fact are reviewed under Title 28, United States Code, Section 2254(d)(1) and receive deference unless they were "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."  **Hill v. Johnson**, 210 F.3d 481, 485 (5th Cir. 2000).  The United States Supreme Court has recently advised that:

> Under the "contrary to" clause, a federal habeas corpus court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

**Williams v. Taylor**, 529 U.S. 362, 413, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); **Hill**, 210 F.3d at 485. Questions of fact found by the state court are "presumed to be correct ... and we will give deference to the state court's decision unless it `was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" **Hill**, 210 F.3d at 485, *quoting* Title 28, United States Code, Section 2254(d)(2).

### Insufficient Evidence

Petitioner claims that the evidence adduced at this trial was constitutionally insufficient to support his conviction of second degree murder of Chantell Duncan pursuant to La. R.S. 14:30.1(A)(2)(b). Petitioner argues that the State presented two theories of the case. The first, was that petitioner had restrained and/or incapacitated Chantell Duncan (petitioner's four year old granddaughter)[3] in an unheated room where her core body temperature dropped so low that she died of hypothermia. The second theory was that petitioner was responsible, in whole or in part, for the ongoing abuse and neglect that contributed to the death of Chantell.[4]

The Supreme Court clearly established the federal law as to sufficiency of evidence claims made in petitions for habeas relief in **Jackson v. Virginia,** 443 U.S. 307,

---

[3]See State Record, Vol. 2 of 4, Transcript of Trial, page 421, hereinafter T. ____.

[4]See Fed. Record, Doc. No. 1, Petition page 3.

319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1976).  The **Jackson** test requires a reviewing court to

find that no rational trier of fact, after viewing the record in the light most favorable to the

prosecution, could have found all the elements of the crime proved beyond a reasonable

doubt.  **Id.,** at 319.  In applying the **Jackson** test, the U.S. Fifth Circuit has instructed a

reviewing court to examine "the substantive elements of the criminal offense as defined by

state law."  **Dupuy v. Cain,** 201 F.3d 582, 589 (5th Cir. 2000).

> In its analysis of petitioner's insufficiency of evidence claim, the Louisiana

Court of Appeal, First Circuit first set forth the applicable law, stating in pertinent part:

> The standard of review for the sufficiency of the evidence to
> uphold a conviction is whether, viewing the evidence in the light
> most favorable to the prosecution, any rational trier of fact could
> conclude that the state proved the essential elements of the
> crime beyond a reasonable doubt.  **Jackson v. Virginia,** 443
> U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).  See
> also La.C.Cr.P. art. 821(B); **State v. Massall,** 523 So.2d 1305,
> 1308-09 (La. 1988).

**State v. Booker,** 839 So.2d 455 at 458.

> The Louisiana Court of Appeal, First Circuit, **State v. Booker**, 839 So.2d at

458 set out the definition of the following offenses:

> La. R.S. 14:30.1 defines second degree murder as follows:

> A.  Second degree murder is the killing of a human being:

> (1) When the offender has a specific intent to kill or to inflict
> great bodily harm;  or

* * *

(2)(b) When the offender is engaged in the perpetration of cruelty to juveniles, even though he has no intent to kill or to inflict great bodily harm.

Cruelty to juveniles is defined in La. R.S. 14:93(A) as the "intentional or criminally negligent mistreatment or neglect, by anyone over the age of seventeen, of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child." The term "intentional" as used in La. R.S. 14:93 refers to general criminal intent to mistreat or neglect and does not require an intent to cause the child unjustifiable pain and suffering. **State v. Morrison,** 582 So.2d 295, 302 (La.App. 1st Cir.1991). "Mistreatment" as used in this statute is equated with "abuse." **State v. Comeaux**, 319 So.2d 897, 899 (La.1975). Criminally negligent mistreatment or neglect of the juvenile exists when, although neither specific nor general intent is present, there is such disregard of the interest of the juvenile that the defendant's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances. **State v. Morrison**, **supra** at 302;  La. R.S. 14:12.

The Louisiana Court of Appeal, First Circuit stated:

Thus, in order to convict the defendant of second degree murder where the killing occurred during the perpetration of cruelty to a juvenile, the state was required to prove either that (1) the defendant intentionally abused or neglected Chantell, resulting in the infliction of unjustifiable pain or suffering, and ultimately, death;  or (2) that the defendant's abuse or neglect of Chantell was criminal negligence that caused the infliction of unjustifiable pain or suffering, and finally, her death.  La. R.S. 14:30.1(A)(2)(b).

**Ibid,** p. 459.

7

The Louisiana Court of Appeal, First Circuit rendered a detailed discussion regarding the trial testimony, and of physical and scientific evidence. (See **State v. Booker,** 839 So.2d 455, 559-463.) After review of the entire record and transcript of the trial, I have determined that the First Circuit's discussion of the trial testimony and evidence is supported by the record and is accurate. Accordingly, I adopt the discussion and present it herein.

In this case, the state presented testimony of Dr. Scott Benton, the medical director of the Children at Risk Evaluation Center at Children's Hospital. Dr. Benton testified that on December 18, 2000, Chantell arrived at Children's Hospital in critical condition. She was in a comatose state, had significant blood loss, the acidity of her blood was dangerously high, and her core body temperature was very low (approximately 84 degrees). Dr. Benton noted that because her systems were not functioning properly, Chantell had a significant amount of swelling in her abdomen, legs, feet, hands and face. Dr. Benton also noted that the child had poor hygiene. She was very dirty, had foreign matter in her hair, and reeked of a foul body odor. Dr. Benton testified that Chantell also appeared significantly malnourished. He explained that there was no fat beneath her skin surfaces and her height and weight were well below the 5th percentile on a growth chart for a child of her age.

Dr. Benton also noted numerous visible injuries to Chantell's body, which he opined could have only resulted from abuse. Dr. Benton testified that Chantell had extensive

bruising and scarring on her face, trunk, abdomen, arms, wrists, and legs.  She had numerous looped or semicircle type scars over her entire body.   Some of the scars were fresh, some were healing and some had already healed.  Dr. Benton testified that, in his medical opinion, these looped or semicircle type scars are typically the result of the child being hit on the skin with an extension cord or similar object.

Dr. Benton also noted ligatured or encircling cuts around Chantell's wrists. He testified that ligature markings on the wrists usually occur when something used to abusively restrain the arm cuts into the skin.  Dr. Benton opined that these ligature markings were recent injuries because there was fresh blood dried over them.   Evidence of older ligature scarring was also present on the child's wrists and ankles.

Dr. Benton further testified that x-rays revealed several fractures in Chantell's hand and foot.   From the x-rays, Dr. Benton also noted a twisting or grabbing-type injury to Chantell's right arm.   Dr. Benton explained that this type of injury occurs when the layer of muscle covering the bone is painfully stripped away.  According to Dr. Benton, "the only thing that causes this particular pattern of injury is a grip around the muscle where there's shear forces going around the bone."

Dr. Benton testified that most of the injuries found on Chantell's body were intentionally inflicted, abusive injuries.    Dr. Benton further testified that Chantell's

condition, particularly the fresh lesions on her body, clearly indicated that the child had suffered a great deal of pain prior to her death.

Lieutenant Jimmy Richard of the St. Tammany Parish Sheriff's Office testified that he observed the victim's physical condition at St. Tammany Parish Hospital.   Lieutenant Richard testified that the child had marks around her wrists, loop-type scars and sores over her entire body, and a contusion on her forehead.   Lieutenant Richard further testified that although it was freezing outside that morning, Chantell wore only a sleeveless shirt and shorts.

After observing Chantell's physical condition and speaking with Kenisha Duncan, Lieutenant Richard secured search warrants and returned to the Riverside Drive property to investigate.   Although the child was originally found inside the main house, Lieutenant Richard subsequently learned that the child actually became ill in the small cottage.   In searching the cottage, Lieutenant Richard observed numerous small plastic/wire ties on the floor.   He testified that although many of the ties had been cut, they remained in a small semicircular shape.

Lieutenant Richard also testified regarding the deplorable condition of the house.   He stated that the entire house was covered in dishes, pots, rusted cans, and other trash.   There was a large hole in the ceiling of one of the bedrooms that extended through the roof, allowing cold air, rain and other debris to enter the house.   There was no evidence

that anyone slept in that room.   A door inside the room led to the bathroom.   There was also another door, on the other side of the bathroom, which led to another bedroom.   Lieutenant Richard noted that the door between the room with the hole in the ceiling and the bathroom was broken and could not close completely.   The door of the other room had a lock on the bedroom side, which could be used to lock the bathroom from the outside.

Lieutenant Richard testified that there was a musky odor and dampness throughout the house.  The dampness trapped inside the house made it feel colder inside than it was outside.   He stated that throughout the investigation he would walk outside at times "to warm up."   Lieutenant Richard additionally testified that a report from the National Weather Service indicated that the outside temperature on the night before the child's death dropped to at least 29 degrees.

Detectives Jobeth Rickels and Earl Clark, of the St. Tammany Parish Sheriff's Office, Juvenile Division, also testified at the trial.   Detective Rickels indicated that upon learning of the child's physical condition at the hospital, she and Detective Clark went to the Riverside property to speak with the defendant.   Detective Rickels testified  that in response to questioning, the defendant indicated Chantell and Kenisha had spent the night in the main house, while he spent the night out with friends.   Detective Rickels testified that the defendant told her that Kenisha and Chantell lived with him, but they usually stayed at the big house.   The defendant stated that when he returned home (to the main house) that

morning, he went to check on Chantell because he heard her hollering. According to the defendant, when he found Chantell and observed her condition, he instructed Kenisha to call for help.  The defendant stated that he administered CPR until the medical personnel arrived. Upon the defendant's request, Detective Rickels recorded the defendant's statement in written form.   She then read the statement back to the defendant and he signed it.   This written statement was introduced into evidence at trial.  (State's Exhibit # 56).

Detective Clark testified that he also questioned the defendant in conjunction with the investigation of this matter.    Detective Clark testified that in response to questioning, the defendant admitted that he had, on occasion, restrained and physically disciplined Chantell.   The defendant told Detective Clark that he had also used corporal punishment to discipline Chantell.   The defendant stated that he had hit Chantell with a yardstick, a bamboo switch and sometimes a belt.  The defendant told Det. Clark that he had physically disciplined Chantell three or four days prior to her death, when she was caught drinking water from the toilet.   The defendant explained that the child drank from the toilet because she was not allowed in the kitchen.   The defendant also admitted that he had, on occasion, held Chantell by her left upper arm while whipping her.   Det. Clark testified that the defendant also stated that he sometimes used plastic/wire twist ties to restrain Chantell. According to Detective Clark, the defendant explained that when he restrained Chantell he used three twist ties, one on each of her wrists and one to connect the two wrists together.

12

The state also presented medical testimony from Dr. Michael DeFatta, Chief Deputy Coroner for St. Tammany Parish.   Dr. DeFatta performed an autopsy on Chantell's body on December 19, 2000. Dr. DeFatta testified that at the time of the autopsy, the four-year-old child weighed roughly 25 pounds and was thirty-five inches in height. For a child her age, Chantell's height and weight were well below the 5th percentile on a growth chart.   Dr. DeFatta testified that this indicated significant growth stunting and malnourishment.   As further evidence of malnourishment, Dr. DeFatta testified that upon internal examination, he noticed that Chantell had minimum fat in the abdominal area, which indicates "a very low nutrition state or malnourished state."

Like Dr. Benton, Dr. DeFatta also testified regarding Chantell's physical condition at the time of death.   Dr. DeFatta testified that Chantell had numerous abrasions, lacerations, bruises, and scars over her entire body.   These injuries were noted as being in various stages of healing, some were recent and some old.   In some areas of Chantell's body there was evidence of recent injuries on top of older healed injuries.   Dr. DeFatta also observed the ligature marks around Chantell's wrists and ankles, which, he opined, suggested that the child had been bound.   Dr. DeFatta further testified that the position of bruising on the lateral portion of Chantell's body indicates that her arms were likely held back over her head or held back during some of the beatings.   Scratches near the ligature marks on Chantell's wrist indicate that the child struggled to free herself from the bindings.   Chantell

13

also had areas of recent bruising to her forehead.   A reflection of Chantell's scalp revealed recent head trauma.   There was extensive hemorrhaging beneath the scalp surface covering the right side of Chantell's head.   This type of injury is consistent with multiple blunt traumas over the entire right side of her head.   Dr. DeFatta also testified that this type of hemorrhaging could possibly result from painfully pulling the hair in that area.   Dr. DeFatta noted that at the time of the autopsy, a large portion of Chantell's hair was missing from her scalp in this area.   Dr. DeFatta further testified that the force from these injuries, certainly the blows, could have easily caused unconsciousness or concussion.

Dr. DeFatta defined hypothermia as the decreased core body temperature.   He indicated that the medical reports indicate Chantell's core body temperature upon initial examination on December 18, 2000, was recorded in the low 80's.   He testified over objection that in his opinion the hypothermia that caused Chantell's death occurred for one of three reasons:   she was tied up so that she could not get out of the cold, she was unconscious because of the blows to her head, or she was locked in the cold bathroom, otherwise she would have sought warmth.   He explained that the severe physical injuries to Chantell's body-the scars, the healing injuries, and the recent injuries-when observed together are defined as Battered Child Syndrome.    Children suffering from this syndrome are typically undergoing neglect, he said, and especially in this case, obviously abuse and torture.

14

Dr. DeFatta opined, "[t]his child certainly didn't have a chance to survive the cold temperatures in her badly beaten and malnourished state."

The defendant testified on his own behalf at trial.   Regarding his previous statement indicating that he spent the night out with friends, the defendant admitted, under oath, that this statement was not true.   He also confessed to having provided false information to the investigating detectives when he told them that Chantell and Kenisha spent the night in the main house.   The defendant testified that on the night before Chantell's death, he was home (at the cottage), with Kenisha and Chantell.   He testified that he worked outside repairing a vehicle all night.   The defendant testified that at some point during the night, he entered the house and found Kenisha asleep in the living room and Chantell awake in the bedroom.   He stated that heaters were on in the living room and the bathroom.   The defendant testified that the next time he entered the house, at approximately 7:00 a.m., he found Chantell lying on the bedroom floor in a fetal position.   He stated that the child was moaning and "wasn't breathing real well."   The defendant testified that Chantell's clothing was wet, like she had been getting water from the toilet.   The defendant testified that he removed the wet clothing from the child's body, took her into the living room, placed her in front of the heater, and began CPR.

During his testimony, the defendant admitted that he physically disciplined Chantell.   However, he claimed to have only "spanked" her with his hand, "popped" her in

15

her hands with a twelve-inch ruler, or "popped" her on her buttocks with a belt.   The defendant denied ever telling Detective Clark that he hit Chantell with a bamboo pole. Consistent with his prior statement given to Detective Rickels, the defendant testified that the most recent episode of physical discipline was only four days prior to Chantell's death, when he hit Chantell for drinking water from the toilet.   The defendant stated that Chantell sometimes drank water from the toilet because she was not allowed in the kitchen.   The defendant denied ever seeing Kenisha beat Chantell with anything that would have caused the bruises and scars on the child's body.   The defendant acknowledged that he used plastic, "garbage bag tie like" objects as restraints to prevent Chantell from climbing.   He stated that he placed the ties on Chantell's wrists loosely, and only left them in place for up to 35 minutes.   The defendant claimed he never left the room while Chantell was restrained. When questioned regarding the extensive bruising and scarring on Chantell's body, the defendant testified that he never saw these injuries.   He stated that because Chantell often wore his shirts, which were extremely large, he was never really able to observe the child's body.   Contrary to medical testimony indicating that Chantell was significantly malnourished, the defendant testified that he often fed, and sometimes even "overfed" Chantell, "because [he] knew she liked to eat."

After considering the trial evidence and the applicable law, this Court concludes that all of the elements of the crime of second degree murder were sufficiently proved.   The

Louisiana Court of Appeal, First Circuit correctly applied the **Jackson** test in evaluating the

sufficiency of the evidence claim:

> The Louisiana Court of Appeal, First Circuit said:
>
> When viewing the evidence presented at trial in the light most favorable to the prosecution, we are convinced that any rational trier of fact could have concluded beyond a reasonable doubt that all of the elements of the crime of second degree murder were sufficiently proven.  The evidence clearly established that Chantell was severely abused and neglected throughout her life. The four-year-old child was bound, beaten, and deprived of food.   Although the immediate cause of Chantell's death was listed as hypothermia, the secondary causes listed were Battered Child Syndrome and malnourishment.   Medical testimony at trial clearly indicated that the child's weakened physical condition, which was due to malnourishment and Battered Child Syndrome, hastened her death.     The medical testimony presented at trial, particularly the testimony indicating the existence of fresh or recent abusive wounds and/or ligature markings, some of which were only hours old, reasonably supports the conclusion that Chantell was beaten severely, possibly rendered unconscious, tied up, and left in an unheated room prior to her death.   Viewing all of this evidence, together with the defendant's statements to the investigating detectives and his trial testimony, wherein he admitted that he occasionally and intentionally struck Chantell with various objects, grabbed and/or held her left upper arm while striking her, and placed plastic twist-ties around her wrists to restrain her, any rational trier of fact could have concluded beyond a reasonable doubt that the defendant was engaged in cruelty to a juvenile.   Moreover, based upon the defendant's untruthfulness during the investigation of the offense, it would not have been unreasonable for the jury to find that he was not credible.  From the defendant's dishonesty when he claimed that he was not at home on the night Chantell froze to death, an inference of a

"guilty mind" can be drawn**.   State v. Mitchell**, 99-3342, pp. 10-11 (La.10/17/00), 772 So.2d 78, 85.

Considering the foregoing, we find that the evidence presented at the trial of this matter clearly supports a finding that the defendant committed cruelty to Chantell, a juvenile, which ultimately resulted in her death.   This assignment of error lacks merit.

**State v. Booker,** 839 So.2d at 463-464.

This claim is meritless.

## Unconstitutionally Vague Statutes

Petitioner claims that his conviction should be reversed because the statutes under which he was convicted, La. R.S. 14:30.1(A)(2)(b) and La. R.S. 14:93(A), are unconstitutionally vague as applied to him.  He claims that a person of ordinary intelligence reading these statutes would be incapable of discerning the statutes proscriptions and would not be given fair notice of who, other than a parent or legal guardian, may be criminally responsible for neglect of a child.  Moreover, petitioner suggests that a person of ordinary and reasonable intelligence would not have gone to the Louisiana Children's Code, Article 603(3) to discern who, if anyone, other than a parent or legal guardian, might be held criminally responsible for the neglect of a child (i.e., a "caretaker").  Finally, petitioner argues that there is no reason to believe that the legislature intended the criminal

18

responsibility for neglect to extend beyond the primary caregiver or some other person with legal responsibility for the care of the child.[5]

The respondent argues that the subject statutes are, in fact, not constitutionally vague because they provided petitioner with notice that he could be criminally charged with second degree murder.  Thus, no violation of due process of law occurred.

The Fourteenth Amendment to the United States Constitution, in pertinent part, provides for the right to due process of law as follows:

> **Section 1.** ... No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

In **Broadrick v. Oklahoma,** 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), the U.S. Supreme Court set forth the following standard for reviewing a statute for vagueness or overbreadth, <u>to wit</u>:  a statute must describe the proscribed conduct "in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest."  413 U.S. at 608, 93 S.Ct. at 2914. Moreover, the Supreme Court would not entertain a challenge to the "uncertainty" of a statute where the defendant's conduct fell "squarely within the 'hard core' of the statute's proscriptions."  **Id.**

---

[5]See Fed. Record, Doc. No. 1, Petition under Title 28, United States Code, Section 2254, pages 5-6.

A review of the applicable state law is necessary to resolve the subject claim.

La. R.S. 14:30.1 defines second degree murder in pertinent part, as follows:

A. Second degree murder is the killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

\* \* \*

(2)(b) When the offender is engaged in the perpetration of cruelty to juveniles, even though he has no intent to kill or to inflict great bodily harm.

La. R.S. 14:93 provides, in pertinent part, as follows:

A. Cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect, by anyone over the age of seventeen, of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. Lack of knowledge of the child's age shall not be a defense.

La. Ch.Code art. 603(14) defines neglect as follows, in pertinent part:

(14) "Neglect" means the refusal or unreasonable failure of a parent or caretaker to supply the child with necessary food, clothing, shelter, care, treatment, or counseling for any injury, illness, or condition of the child, as a result of which the child's physical, mental, or emotional health and safety is substantially threatened or impaired. . . .

La. Ch. Code art. 603(3) defines caretaker as follows:

(3) "Caretaker" means any person legally obligated to provide or secure adequate care for a child, including a parent, tutor, guardian, legal custodian, foster home parent, an employee of a public or private day care center, an operator or employee of a family child day care home, or other person providing a residence for the child.

La. R.S. 14:30.1(A)(2)(b) does not, on its face, provide a limitation that the

offender must be a parent or legal guardian. Moreover, La. R.S. 14:93(A) does not provide

a limitation that the offender who has intentionally or criminally mistreated or neglected the child must be a parent or legal guardian.  The statute specifically says that <u>anyone</u> over the age of seventeen may be charged with cruelty to <u>any</u> child under the age of  seventeen.  Therefore, the statute as applied to petitioner gave him adequate notice that the statute applied to him.  The reporter's comments regarding La. R.S. 14:93 clarify that anyone can be criminally culpable for mistreatment under that statute and ultimately under La. R.S. 14:30.1.

With regard to petitioner's claim, the Louisiana First Circuit stated:

The Reporter's Comment to this article provides, in pertinent part:

Scope:

This section is intended to cover both the mistreatment of children and their neglect.

The section does not limit criminal responsibility to the parent or guardian, and thus anyone may commit the crime.  But as the (sic) neglect it logically follows that only one with legal responsibility towards a child can be held for criminal neglect.

What constitutes a neglected child:

The present Louisiana statutes which determine the jurisdiction of the juvenile courts lay down the rules as to what constitutes a neglected child;  it is intended that these same rules be used in interpreting this section.   See Acts 1921 (E.S.), No. 83, § 6 (neglected child defined);  Acts 1924, No. 30, § 9 (neglected child defined);  Acts 1921 (E.S.), No. 126, § 3 (neglected child defined).

21

> In response to a pretrial motion to quash, the trial court ruled on the applicability of La. R.S. 14:93.   The trial court found La. R.S. 14:93 applicable to this defendant under the facts and circumstances of this case.   In its reasons for judgment, the trial court noted that while the reporter's comments to La. R.S. 14:93 suggest it is logical that one who is not legally responsible for a child should not be convicted of neglect, the comment also suggests that the laws governing the jurisdiction of the juvenile court should be consulted to determine what constitutes a neglected child.

See **State v. Booker,** 839 so.2d at 468.

After review of the challenged statutes and the applicable law, this Court finds that La. R.S. 14:30.1(A)(2)(b) and La. R.S. 14:93(A) are not constitutionally vague as applied to petitioner Booker.  The challenged statutes provided petitioner with fair notice that he could  be charged with second degree murder during the commission of cruelty to a juvenile.  Petitioner's claim is meritless.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the instant habeas corpus be **DENIED WITH PREJUDICE** as meritless.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such

consequences will result from a failure to object.  **Douglass v. United Services Auto. Ass'n**, 79 F. 3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this 7th day of  December, 2006.

LOUIS MOORE, JR.
United States Magistrate Judge

23